Here ye, here ye, here ye. This Honorable Appellate Court, the Second Judicial District, is now open for soon to be adjourned. The Honorable Susan F. Hutchinson will be presiding. Please be seated. Your Honor, this case will be documented. On 2-14-0124, before the State of Illinois, Plaintiff Appellee v. Mayor W. Gambiani, 10 minutes time. Arguing on behalf of the Supreme Court, Judge Mr. Steve Greenberg. Arguing on behalf of the Plaintiff Appellee, Attorney Ms. Kristine O'Hanlon. Good morning, counsel. Mr. Greenberg, when you're ready, you may proceed. Thank you. This is, as this Court knows, the second go-round for Mr. Gambiani. He had a trial. He was convicted. The case was returned to the trial court. The first was returned to the trial court, and he had a second trial. And unfortunately, the second trial suffered from infirmities different than the first trial in some respects, and some the same. Well, that's an interesting question just generally. If certain things happened in the first trial, and the second lawyer looking at the first trial record and our opinion, what does that mean for these errors that you're now talking about? Well, on a couple of them, the judge said, I'm going to rule the same as I did on the first trial. There were things that weren't necessarily raised in the first appeal. However, for instance, the exclusion of people from the courtroom. However, I don't think that makes a difference because other than the doctrine of maybe law of the case, if it wasn't reviewed by the appellate court the first time and it affected the second trial, I think it can be raised again. What about it could have been but wasn't, which would be sort of a waiver argument? If it could have been but it wasn't, it doesn't matter because it still affected the trial that we're concerned with here. We're concerned with what happened at the second trial, not so much what happened at the first trial. The only reason I bring that up is because when you're a lawyer looking at it and the judge says, I'm going to rule the same, you may be a little less motivated to make some of the arguments. So when you're trying to decide if an issue is necessarily waived, you're sort of like, this was argued last time, so you kind of lose your enthusiasm for it, so to speak. And that really shouldn't be held against Mr. Gaviani. But the first issue that I'd like to start with is one that I don't think came up in the first trial, and that's what I'd like to refer to as the truth detector issue. In the second trial, they called a psychologist to testify that the young man had come to see him, the mother finds out that her son was allegedly sexually assaulted. She takes him to see a therapist who happens to be a psychologist. And the child tells the therapist about it. The therapist is a mandated reporter, then contacts the police. That's how the police become aware of these allegations. The mandated reporter, the psychologist, testifies at the second trial, and he tells what the child told him. I understand there's a statute that allows that, and there's reasons why they've decided that you should be able to present a witness to say that a child sex victim said the same thing to me. But then they got into this dialogue with the doctor about his opinion, and the state said... Who got into that dialogue? The state did. But it was first brought up on cross-examination, right? Well, that was the position that the state took. They said that the door had been opened because the doctor had been asked about generally examinations of children and how children react to sexual assault situations. The trial court, though, found that the door was not opened on the issue. This is on page 3486 of the record. And the court said you can't ask him these questions. You can't ask him if what the child said was truthful or seemed to be inconsistent with your experience. Yet then they went and asked how is the child's demeanor, and the doctor said it was consistent with telling the truth. Now, was there an objection to that question, to that one, as it occurred? There were objections. There was a sidebar. The exact question was was there anything about his story that was inconsistent with your training, or he was saying to you the doctor said no, and that was not objected to. And then how was his demeanor? It was consistent with the kid telling the truth. That was not objected to. But there had been an entire sidebar, and the trial court had told the state not to get into this. Don't get into anything regarding the truthfulness of the child. But the state did, and the defendant didn't really, the defense counsel didn't object, even for the record. He did not object a second time. And then the state got up in closing and said the family went to a doctor to see if the allegations were true, and, in fact, the doctor said the allegations were true, and that, I believe, was objected to in closing argument. Rizzo was called as a factual witness, not as an expert witness, correct? That was certainly the position that the state has now taken. However, at the trial court, the court acted as if he was an expert. The court addressed him as if he was an expert. No one ever said we're tendering him as an expert, but they went through his expert qualifications. If you look at the statute, there would be no reason to call him other than if he was being called as an expert. Otherwise, he would just be some layperson who the child talked to for outcry. But under the statute, I think he was called as an expert. If you look at the, if you don't use the words we're tendering this witness as an expert, still, you know, what is it? If it looks like a duck and it walks like a duck. Well, it's important to actually show how the police, how this came to the attention of the police, though, correct? That's what he was called for. But you don't need the hearsay to do that. In fact, there's a lot of cases where they try and put a hearsay in courts of investigation. And they could have certainly just said the mother brought the child to the doctor, which the mother had said. And after the child was brought to the doctor, the police were notified. I mean, that's all that's necessary to show the course of the investigation. Certainly, the substance of the statements weren't necessary for that. And then the state went out, as I said, in closing argument and said, he told you the child was telling the truth. Now, if you're a juror and whether someone's told you this is an expert or not, you've got a psychologist who testifies, who specializes in these areas. The child was brought to the psychologist because the mother was concerned about the allegations and whether you've been told that they're an expert or not. When that witness says this was consistent with someone, I've examined hundreds or thousands of people, and it was consistent with someone telling the truth, and then the state gets up and says the doctor told you. They didn't just say Joe Blow off the street, down the street said he thought he believed it. The doctor told you that he had been seen, they wanted to know if the allegations were true, and, in fact, they were true. That's the jury's function to decide if the allegations are true. That's not the function of the doctor. How was this issue then preserved post-trial? I do not believe it was raised in the post-trial motion. Well, then how should we consider it? I think you should consider it as a plain error because it's so egregious that you've got someone actually testifying that a witness is truthful. Well, no, you have the state arguing that he said the witness was truthful. You have the witness testifying about his demeanor was consistent. I mean, he didn't say to the jury, I believe he was telling the truth, did he? He said it is consistent with somebody telling the truth. So those were his words. This is consistent with someone telling the truth. His demeanor is what? Right, which is, to me, the same as saying he was telling the truth. I talked to him. I observed him. I watched him. I listened to him. I saw how he reacted to what I was asking, and it was consistent with someone telling the truth as opposed to, I suppose, well, he hesitated. He paused. He thought long and hard. He looked down at the ground. He wouldn't look me in the eyes. Maybe those things didn't happen. Well, but that would be, and that was consistent with someone not telling the truth. And you have to, it's not just the one doctor. They call a number of witnesses and get in these statements under the guise of medical evidence. For instance, the people who examined the child at the hospital were called to put in the child's statements because there would be no other reason for the state to call them because they didn't find any physical evidence of abuse. So they kept putting in the same kinds of things. Do you have, if we don't have any other questions on that, did you have any other issue you wanted to specifically address? I do. Because we have some questions. I have a question. Go ahead. I'll defer to your questions rather than what I want to say. You argue that counts 7 through 24 should have been joined with 1 through 6, but yet there was no speedy trial demand. Isn't there a speedy trial demand that is required here? So Mr. Gambiani was out on bond electronic monitoring. It was a condition of his bond that he be on the bracelet, which is functionally equivalent in my opinion to being in some form of custody. Even if he's on bond. So we have a body of case law where the courts have said that if you're in custody, join or applies, the 120-day rule under Williams applies. If you're in custody, even if you agree to every contingent, so you can have someone who's in custody who is not making any demand of any kind whatsoever, but by operation of law, the 120 days applies under the Williams line of cases. Why should it be any different for someone who's out of custody? Because the same reasoning applies. The reasoning is that you perhaps would not be agreeing to these continuances if you knew about these other charges. But there were things happening in this case that, I mean, there weren't just agreeing to continuances to take the case along. There were motions, there were some negotiation, isn't that correct? There were some things going on, but that doesn't matter under the 120-day rule. But again, that depends on whether he was in custody. Right. Yes, go ahead. A defendant can be in custody and be waiting to litigate his motion to suppress. Well, let's assume he was out of custody. Right, but see, this is why I'm analogizing to it. He was in custody, files his motion to suppress. All the continuances in the world are attributable to him for speedy trial purposes, but not under the Williams rule. So why should it be any different? It's a different time frame. It's 160 days versus 120 days. But every reason that the Williams rule exists applies equally to the out-of-custody defendant. There's no functional difference except one's in custody and one's out of custody. But in the way they're approaching the case is the exact same. They may be negotiating, they may be filing motions, they may be doing all these things. So there's this arbitrary rule that applies to the person that's in custody. And what we said in our brief is if you take this to its extension, then what if I file a motion for speedy trial, a demand for speedy trial, on day one? And on every date after that, I'm out of bond, I agree to a continuance. But I've got the written demand for speedy trial that's been filed on day one. Does that written demand then apply to all of the uncharged offenses? Because it should, just like with the 120-day rule. So the rules should not be different. The rule that's been created is because your — the thought is you can't agree to continuances for uncharged offenses. You don't know about those, you're not agreeing to continue those, and you're being prejudiced if the 120-day rule wasn't enforced. So why not apply the same rationale to the 160 days? Does the statute for compulsory joinder or for joinder require a speedy trial demand? No, it doesn't. It's the case law that has always referenced it, correct? Right, right. It's the case law that has created this need to bring the charges. Well, in any of the cases that you've cited, did it say, did the case say it had to be pursuant to the speedy trial, or did the cases just sort of line up that a speedy trial demand was filed and this is what happened after that? No, the cases actually line up that the speedy trial is implied. It's implied when you're in custody. But no, I'm talking about out-of-custody, the out-of-custody cases. Did any of them say that a speedy trial demand was required, or did those cases say that a speedy trial demand had been filed and therefore as a result? There weren't any cases which went to what we're saying here, where no demand was ever filed and the 160-day rule should apply. There's no cases either way. I think it's a new issue for the court, frankly. This statutory authority does, though, talk about the cases should be joined if it is the same act. How does this fit the same act requirement? Well, because there was initially a child pornography charge filed. There was one. And I know they say that it was for a photo that was found on a phone. That photo had, in fact, I think was also found on the computer when that was done. So it could be they'd done the search, they knew about the charges. It arose out of the same thing. The facts of the case were that he was showing the child child pornography that was on the computer. But didn't the child say that they watched videos as opposed to looked at pictures in his apartment? I think he said that they watched videos and he had shown him pictures of other people and things that he wanted to do to the child. I believe it was both. And the state was clearly aware of it because they filed a motion and cited this additional evidence right away when they went to increase the bond conditions very early in the case, a year before they filed the additional charges. Do we have any idea from this record what took so long to file those charges? No. Do we have any reasonable inferences in this record what took so long? I mean, I can add to the record and tell you what it was. No, no, just reasonable inferences from the record. I think that during that time there may have been some discussions going on. I think they referenced them a couple of times. So maybe someone was waiting and sort of holding it as a sword over someone's head. But I don't know that it was agreed to in any respect. And if we were to consider this argument, what constitutional right or what right has been violated here by not bringing them earlier? The right to a speedy trial. The right to know what you're charged with. I think that all of the same rights that come into play under the Williams rule. The right for a defendant to know what he's agreeing to and what he's not agreeing to. I have one other area I want to ask a question about, and that is your possession argument of these particular images. What is the issue? They were on a thumb cache? Correct. There would have to be some affirmative action, I believe, for them to get there? That was what one of the witnesses said, yes. So how would he not possess them for purposes of this litigation or this trial? He exercised some control. It's his computer, so we're going to assume that he exercised the control. Well, and that's part of the problem with it is the assumption that someone – you can have things in your thumb cache without actually looking at them on the screen. So they can be downloaded from a site or they can be downloaded when you've got other – when you're downloading other information. They can sort of piggyback along with it. So is just viewing a picture of this nature possessing? Well, it shouldn't be because the analogy I like to use is if I go – last night I logged on to ESPN.com. Thank goodness it's only that. I watch – I could give other examples, but I don't want to today. Thank you. I log on to ESPN and I watch the highlights of something. That highlight that I watch is actually going to end up in my thumb cache in some form. It's going to end up – did I possess that? If I watch something on my TV set and I watch the 10 o'clock news, am I then possessing the 10 o'clock news? And is this any different? So when I go to a website and I view something without any independent evidence that I had to click, hit download, and so forth, I go to a website and I view something, am I possessing it? I don't think so. At least absence of knowledge that I know about computers. There is a body of case law about people who are involved in various tech jobs and there's sort of knowledge implied to them because they know how computers work, they know how the Internet works, and so forth. But for the novice who doesn't know that, the average person, when you go to a website and view something, that should not be possession because you're not acquiring that. At least you're not knowingly acquiring it. You're looking at it on someone's website. In most of the cases that were cited where possession was found or determined by the court, they had some either web browsing history, timelines, admissions. Here we have what appears to be admitted videos that were there by your client admitting and the child saying that we watched them. And the evidence says about another hundred images. And those were introduced as other crimes evidence. Is that sufficient to show that these 18 images that were actually charged were part of a bigger, say, possessory situation? In our opinion, no, because there's no showing of knowledge that he knew that they were. I can see two or three or four, but we have, by everybody's account, several videos and a certain image from a video, and we have maybe a hundred other images. How does that just happen without anybody's knowledge? How does it get on the computer without anybody's knowledge? Because people don't know how computers work. If I took out my laptop, you could find all sorts of stuff on my laptop. There we go again. We don't want to do that. No, no, we don't want to. I'm not saying it would be important. But all sorts of things from websites that I've visited. And I don't know how that gets there. Every time I go and I buy something or I look at something at Macy's.com, for the next week, everything I look at on the Internet, I've got all these things popping up on the side of my computer trying to get me to buy the stuff that I didn't want to buy. That's why I didn't buy it. And that is apparently, because I have a little knowledge about computers, that's apparently something that they have sent, a cookie or something that's been saved on my computer so that when I browse, it's popping up. And that was the issue, I think, in Josephitis. Right. There were cookies everywhere. Right. I don't know this. I mean, I'm not, am I now possessing, if I go into Macy's and I looked at pictures of little kids, you know, modeling clothes, okay, and I'm not supposed to look at pictures of little kids modeling clothes, do I now possess these things that are popping up on my computer? And here there's not even any showing that he knew that the stuff was ever popping up or anything like that. So if it was charged as viewing, looking at, that might be a different story. But we don't have that particular statutory charge. Right. It's possession. And possession is, you have to knowingly possess an item. So, you know, you have to have some idea that it is there. So I think they have to show some mechanism whereby someone went out, acquired the item, saved it, and so forth. Does the fact that there was a picture in that same thumb cache that he took, which would qualify as child pornography, that he took a picture of the victim standing there naked or his hand on his penis or something, does the fact that that is in with the other pictures show that he possessed? If we were talking about it was saved in iPhoto, I would think… The file? You're talking about a certain file? A certain file. So the files, the file of the child and the image that was saved in an iPhoto, and I just used that as an example, but, you know, the program, where you have to consciously put it there? Yes, or sync it from your phone to there. But I don't think you can say that because there was a picture on a phone and it got synced to the computer somehow, however, I don't know whether it was automatic through the cloud or how that happened, and it's found in the same computer file that other things are, that he would necessarily know that. Because you're still talking about the inner workings of the computer. Now, with respect to that particular photo, I think that it's a much stronger case that he knowingly possessed it because he would have somehow downloaded that or transferred it or known that it went from the phone to the computer. But as far as the other items go, just because they're found in the same place of the computer memory, I don't think you can say that, absent some showing, if there had been a file that said child porn. You know, that he had created for that purpose. But those other 18 don't get there randomly into that same file. That's where photos, that's where the photos, the computer itself stores photos in a thumb cache. That's where those photos got. I'm not even, I'm not sure that the image of the child was in the same one. I actually will check that while the state is arguing. But they all go, all of the stuff, a thumb cache is not a file that an individual creates. It's a file created by the operating system automatically. So, like an operating system might create a documents file. In my documents file, I may create some files. A thumb cache isn't like that. A thumb cache is actually the inner workings of the computer. And it doesn't actually have the document. It has an image of the document. It has some kind of code. Right. And then my understanding is when you, at some point you open it and it's saved and it explodes and it opens up. Don't open your computer while you're here. All right.  Thank you. Thank you. Ms. Schwinn. May it please the court, counsel. If I may, I'd like to just jump right into the issues of thumb cache and possession. Because that was what the counsel just recently talked about. The issues that opposing counsel raised were addressed by the people. Can I pull that toward you? Sure. Or at least go in the direction it is? Okay. I realize it wasn't centered. I apologize. The people's expert in computer forensics testified about the issue that opposing counsel brought up. I realize this person was identified as an expert. And he had 40 hours of training or something in this area. But what if this expert wasn't totally accurate? Well, this expert was tendered as an expert, was admitted as an expert. Whether or not he was qualified as an expert isn't raised here. Okay. And what if the information he gave might not have been totally accurate in terms of what happens in the browser cache, the TIF, the thumb cache? What if that isn't quite accurate? There's nothing in the record to support that his information was inaccurate. Well, did he introduce the concept of a critical difference between the browser cache and the thumb cache, or is that something you introduced pursuant to argument? Your Honor, he discussed that extensively, the difference between temporary Internet files and thumb cache. Is that the primary difference, that one's temporary and one's not? I mean, what's the critical difference? The critical difference is this. In temporary Internet files, and I'll just direct the Court, he begins his discussion on page 3625 of the record. He specifically talks about temporary Internet files on pages 3645 through 3647 of the record, and then again in rebuttal. And it's brought out, the difference between temporary Internet files and thumb cache is how it gets on there. And I believe that this Court's decision of people v. Gumilia also talks about temporary Internet files. Right, but it doesn't use the word critical difference. This is a new term that we have not heard before. And respectfully, Gumilia didn't have an issue with thumb cache. They had an issue with temporary Internet files. It was a browser case, yes. And in temporary Internet files, images come in the temporary Internet files when someone goes to a website, such as ESPN. And what they do on the temporary Internet files is that they create in the cache some sort of image or something such that, should the user go onto that Internet website again, so let's say you go onto ESPN at 7 p.m., you close it down. And let's say you want to go back up and check the score at, let's say, 9 p.m. When you go into ESPN again, the images put in the temporary Internet files will help load that website faster. And I believe that was a footnote by this Court explaining temporary Internet files in Gumilia. Yeah, if you could just give me one moment, please. I believe, I apologize, I can't find the footnote. But in Joseph Fizer's Gumilia, they do talk about the fact that temporary Internet file cache is so that when you revisit the website, that website will populate more quickly than if you were to just open it that day or that immediately. Now, the difference between that and a thumb cache is that in temporary Internet files, things such as pop-up advertisements or an inadvertently clicked website, those items would presumably go in a temporary Internet file because you entered it onto that, you know, you went onto that website or that pop-up ad came through. What that would not do is that those images would not go into the thumb cache. And as Detective Ragusa testified, the user has to make an affirmative action, I believe it was Justice Hutchinson who said, has to make an affirmative action such that those images would go in the thumb cache. And that is a critical difference between thumb cache and temporary Internet files. That affirmative action would be in the nature of what? If we're speaking along the lines of websites and a pop-up ad comes on, if that image were to go onto a thumb cache, the user would have to download, save that image, that specific pop-up image itself for it to make its way to the thumb cache. Save it or just click on it and view it and then perhaps exit. Well, it would have to view it outside the Internet browser. It would have to view it in that Windows Explorer that you use for pictures. So something like that would be that you'd have to save it and then subsequently open it up from, Detective Ragusa says, graphical view or icon view. So look at it like in Windows Media or something. Correct. Exactly. Correct. But you'd have to put it there because it's not going to get there on its own. Just from the pop-up, that is correct, Justice Hutchinson. The user would have to make an affirmative action of doing something. And that is a difference between temporary Internet file cache and thumb cache. Is that enough to show possession? Well, when you take that into consideration with all the other evidence presented, it does show actual or constructive possession. Well, in Josephitis, in Gamilia, in, I think there's one other one I looked at, they all had other evidence. They had people admitting, well, Josephitis had the cookies and the favorites. The Gamilia, I think, had, he had actual web information that he searched these sites. What do we have here that is similar to that? Well, we have the defendant admitting that he viewed child pornography videos. We have the defendant admitting that he viewed, that he showed them to the victim. We have the victim testifying that he viewed them on the defendant's laptop. There was a motion in limine that was presented to introduce this evidence for other crimes basis and actually factual of what happened during the course of this transaction or this circumstance, March to June, between these two persons. Was the motion in limine directed at these 18 images or was it specifically directed at something else? And if it was specifically directed at something else, can it be used for this purpose? And I think let's just start with the premise it was directed at something else because I believe it was. But can it now be used to substantiate the fact that with this other video and these other 90 plus images that there is evidence of possession? Your Honor, if I might clarify before I answer your question, are you speaking of the viewing of the video? No. That other crimes evidence? I'm sorry, there were multiple evidence and there's multiple acts during this span. So I'm just trying to understand which. Well, there was a motion in limine to introduce some of this evidence to talk about I think the other pictures, maybe to talk about other crimes that could have been committed in connection with this. Once that motion in limine is granted and this evidence comes in, can the jury consider it for any purpose that it could be used for or does it specifically have to be related to? It came in, all right, let's go back. It came in to show that he was, the defendant might have been grooming the minor, correct? I believe so. Correct. And that was allowed. Can it also be considered to substantiate these 18 photographs as being possessed because it is also evidence of other crimes of a similar nature? Your Honor, what the argument on appeal was for us was that there was evidence, circumstantial evidence to support the defendant's knowledge and possession of the child. And what was that? Pornography. What did you use? Well, one, the defendant's own statement. Okay. The fact that the images are not found in these temporary files, but they're found where the defendant has to make some affirmative action. The other, you know, there is a presence of a cleaner program that is on the defendant's computer that would be supportive of such a cleaning, you know, the computer. The fact that there are no images found in the defendant's temporary Internet files at all, that has been either wiped clean, as Detective Ragusev stated, that either that indicates that either the defendant's temporary Internet files were wiped clean or that the images found in the thumb cache were not found from the Internet. I believe, as Justice Spence, you pointed out, the picture of the victim's penis was found in the thumb cache. That's on page 3650 and 3651 of the record. That was People's Exhibit 2 and 14. One was the defendant's penis and one was the victim's penis. And that was found in the same location in the thumb cache as these remainder images. And the mere fact that there are hundreds of these images shows that it's not accidental. I'm sorry. The hundred were in the thumb cache? Yes. All the images in terms of the child pornography charges are all in the same location, which is in this thumb cache. And, you know, again, it's a reasonable doubt case, and at this point we're looking at all the evidence together and there's a sufficient evidence that a rational trier of fact would have found that the defendant possessed child pornography charges, excuse me, child pornography images. And just turning, you know... Can we move on to the... Yes. Let's move on to the joinder. Sure. Is a speedy trial demand required before we can even consider the authority for joinder? As we said before, the defendant did not file a speedy trial demand, which makes it difficult to calculate any sort of speedy trial time frame. And in terms of compulsory joinder, I just would like to point out that the child pornography charge initially was not a possession child pornography charge. It's a manufacture. No, it's a photographing. And those are two distinct different acts between possessing and photographing. So it's not as if we're charging one child pornography possession charge and then charging 20 possession child pornography charges at a later time. There's a specific difference between photographing and possessing, and that gets to the heart of compulsory joinder, which is it must be on the scene act. But between July of 2008 when he was arrested and September of 2009 when these other charges were actually filed, there had been two references by the state. One in the bond hearing within three weeks of the actual arrest of the defendant. Judge, you know we've got some other charges coming. We'd like you to consider that to increase the bond. And then at that motion to suppress hearing, you know, we've had a plea out there. It's been rejected, but we've got some other charges coming. If you knew within three weeks or if the state knew within three weeks there were other charges coming, why did it take until 14, 15 months? Your Honor, I can't answer why it took so long. I don't have that information as to why it took so long. You know, compulsory joinder is required when it's the same act. All right, and you're saying this is not? This is not the same act. So therefore there's no analysis as to how long, you know, in terms of why, I mean, why it took so long is irrelevant because it's not the same act. We're talking about acts in which the defendant sexually abused and assaulted the victim and photographed the victim's penis with acts of the defendant possessing child pornography of unrelated individuals or unknown victims. But if some of those images were used, and just going back to other crimes, if some of those images might have been used, the video might have been used to groom the victim and pique the curiosity of the victim, as it were, listening to what the defendant said. He was curious about what this was. Well, the victim's position was, well, he told me that this is what people our age do. Why wouldn't they be part of the same act? Or is it part of the same transaction, which would not be the same act? Your Honor, in Williams, they were very specific about the difference between act and conduct. And they were very specific about the fact that compulsory joinder requires an act. They explicitly said not conduct because they wanted to ensure that it didn't fall for a series of acts or a series of similarly related acts. And they did that because they wanted it for a single act. Whether or not one might, you know, whether or not the videos, which are not part of the child pornography charges at all, you know, as you said earlier, those are other crimes evidence. But that is not the same act. I mean, just like as we set forth in the Supreme Court Mueller case, murdering a person and then concealing the body are two separate acts, even though they might involve the same victim. Those are in self- It's in my time. Go ahead. And so, therefore, that would similarly, you know, be analogous here, which is abusing, you know, a young boy. Photographing a young boy is not the same as possessing child pornography of different victims. Your Honor, if I just might briefly touch on the truthfulness, because that was the other that was the last issue. And for the other issues, we'll rely on our arguments in the brief. Let's talk about was it ever preserved? Was it preserved properly? The state would argue that they did not preserve the issue. The comment, the specific comment that is challenged was met with no objection. People will admit that there was a discussion as to what the redirect should entail. But ultimately, that specific comment was not challenged. And the Dr. Rizzo was not introduced as an expert, was not introduced as an expert, was not tenured as an expert. Dr. Rizzo was put forward as an individual to show how the case progressed. In this instance, the way that this information was heard was that the victim's brother overheard the victim telling a friend of some incidents with the defendant. The victim's brother runs over to the mother, tells the mother. The mother asks the victim. The victim begins crying and says that the defendant is annoying and stalking him. The mother takes to Dr. Rizzo. Dr. Rizzo wasn't, I mean, was there ever a question asked to Dr. Rizzo, when you heard this, what did you do before you called DCFS or as a mandated reporter? What did you do or what analysis did you do? Was it related that way or was it merely related as the child, whether this child was truthful or not? Well, the direct response was in relation to the cross-examination by defense counsel, which set forth of whether, you know, children make up, fabricate or, you know, or make up allegations of abuse. And then they go forward to, you know, detail that there are, there is an instance in which, you know, there are some reports of children fabricating or making up allegations of abuse. This comment was in direct, you know, direct result of the redirect, which was, well, what are some factors that you look at to determine whether or not, you know, this individual falls in the camp of those instances of fabrication or allegations of abuse? And, you know, the, Dr. Rizzo was led through as to what he looks at, such as consistency in story, whether or not the victim knows of information that he would otherwise not know of unless there was some inappropriate things. And then based upon that evidence, then the question was, well, did he know, you know, did the victim fit into these factors? And they did so. And they said, you know, his demeanor was consistent with these factors. He knew of some information that he shouldn't have known. And so, therefore, that would be the issue of how it came in. It was in direct response. And in terms of whether or not, whether to call the people or introduce a 11510, these statements, that's not raised on appeal. That wasn't raised as an issue as to why he was called. So, respectfully, we don't believe that that's an issue before this court. And if there's no further questions, we'd ask that the court affirm the defendant's sentence. Thank you. Mr. Greenberg, we now are going to hold you to your time this time. Okay. Because we have others who are waiting. That's fine. I'm going to talk really fast. No, no, no. Let me, the last issue with Dr. Rizzo, I have a chance to look back at some of my materials. So he was a clinical psychologist. He was called, he testified about the statements that the child had told him that he was a mandated reporter. And then on cross, he was asked whether children make up stories of sexual allegations. And then on redirect, the state said, is there anything that the child said or did that made you think he was not telling the truth? There was an objection. There was a sidebar. And the state said, I will ask a different way. What do you look for to see if the kid is fantasizing or lying? And there was an objection to that. So while there wasn't a contemporaneous objection when the questions were asked, when there was the sidebar, the defense had said, we're objecting, and the judge had said, I'm going to let him ask it this way. So there was a pseudo-objection, at least at the sidebar. I think that's enough to preserve the issue. I also looked at the information actually from the state's brief about the computer forensics on it. And the detective said that the thumb cache is a folder created by the operating system to store pictures or documents. So they load faster if the user wants to look at them again after they have looked at them on a website. Pop-up ads and websites would appear in the thumb cache unless you saved it somewhere else and opened it through Windows Explorers. And there's nothing about that you have to go through some steps. There's no testimony that you have to go through certain steps in order to get something to load in the thumb cache. Or looking at it through Windows Explorer is different where you look at a website and then you somehow download it and merge it. And, of course, in Josephinus and some of the other cases, this court, I would say, is well-versed in how computers work. Certainly well enough to be its own expert. Are you saying there's any difference at all between a TIFF cache and a thumb cache? I don't know that there is. I, frankly, am a Mac guy, so I don't know. I could not tell you anything about a Windows machine and how they work other than what I've read in relation to some of these cases. Is there anything in the record that discusses the difference between a TIFF cache and a thumb cache? There is. So the TIFF cache apparently specifically requires you to save items to it or websites save items to it so that there can be pop-ups in the future. The thumb cache is apparently where the computer system automatically stores photos and videos, according to the state's own expert. There is nothing in the record in this case that says that the user does anything different for something to get into the thumb cache as opposed to the TIFF. That is not there. It does say that TIFF helps the computer pull up a website faster if the user returns to the same website. So, for instance, if the user is continuing to view pornographic images on a website, you would think you would find stuff in the TIFF file, and that was not done in this case. There was also no computer trail that was testified to that showed, which they can do, they can come up with, which showed that images in the thumb cache were opened on specific days or viewed on specific days. There was, though, a motion in limine that was granted by the trial court dealing with these other crimes evidence. They did not charge the videos. And so they were going to, the stated purpose was we wanted to use that evidence, the state said, to show that, you know, this wasn't a mistake, that he had used them to show the child, to familiarize him with those things, to say that this is what kids our age do, a grooming activity. It's out there now. Can that same evidence be used then to show that these 18 images didn't just pop up? Would that be additional evidence of knowledge? Absolutely not. And why not? Because having done the Ilchin case and so once created what I think is bad law and bad acts, the purpose of bad acts is specific. And that's why you have to raise it beforehand. There's a limiting instruction that's given because they're so prejudicial. So you can't say I'm getting it in for this narrow purpose, and then we're going to open the floodgates and we're going to let you use it for everything and anything. Was there such a limiting instruction given? There was a limiting instruction, I believe, given in this case saying why the other acts were admitted. Yes, because there were other acts admitted and also things that had happened in Florida and Ohio and so forth. And that's how the courts guard against them doing exactly what you're asking about is by giving the limiting, creating the limiting instruction, giving the limiting instruction to make sure that it's not used for an improper purpose. Thank you both this morning for your argument. We will take the matter under advisement, issue a decision in due course, and we will now stand in recess to prepare for our next case. Thank you.